Mark Michael JERVIS, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee,
(Plaintiff below).

No. 87S00–9508–CR–949.

Supreme Court of Indiana.

May 12, 1997.

Charles L. Martin, Boonville, for Appellant.

Pamela Carter, Attorney General, Preston W. Black, Deputy Attorney General, Indianapolis, for Appellee.

1. IND CODE § 35–42–1–1 (1993).

BOEHM, Justice.

In a retrial, a jury convicted Mark Michael Jervis of the murder [1] of Terri Jolene Boyer. The trial court sentenced Jervis to sixty years in prison. In this direct appeal, Jervis raises several issues related to the admissibility of physical evidence and testimony at his trial. He also contests the dismissal of a juror prior to deliberations. This case particularly involves application of the "statement against penal interest" exception to the hearsay rule under Indiana Rule of Evidence 804(b)(3). We affirm.

### Factual & Procedural Background

On August 14, 1993, Terri Boyer went on a drinking spree with her husband, her brother and the brother's girlfriend. The four began in the early afternoon in Hatfield, their home town, and took the brother's truck to visit several bars, the last in Newburgh. In Newburgh, Boyer and her husband got into an argument that resulted in Boyer's leaving the truck. The other three drove back to Hatfield, leaving an intoxicated Boyer to fend for herself. Just before 10 p.m. Boyer found her way to Frenchie's, a tavern in Newburgh, where she asked several patrons to give her a ride back to Hatfield. All refused. At some point, defendant Jervis entered the bar, met Boyer, and offered to take her to Hatfield. The two had no prior acquaintance.

Jervis and Boyer were seen leaving the bar together some time around midnight, but no one actually saw them drive away in Jervis's car. Witness Terry Timberlake testified that he saw a car resembling Jervis's station wagon pull into the Newburgh Cinema parking lot around 11:30 p.m. Timberlake stated that two people, one male and one female, appeared to be in the car, but he could not positively identify them as Jervis and Boyer. Approximately thirty minutes later, Timberlake saw the station wagon leave the Cinema parking lot and park in an adjacent lot of a daycare center where it remained for about ten minutes. It then returned to the Cinema parking lot, and finally drove away. Jervis returned to Frenchie's alone around 12:30 to 1:30 a.m. the

same night, telling those present that he was unable to take Boyer to Hatfield because his car had broken down. Jervis went home a half hour later. At approximately 12:30 p.m. the next day, the owner of Newburgh Cinema found Boyer's body on a grass strip next to the Cinema parking lot. Boyer was nude below her waist and her bra and shirt were pushed up to her shoulders. An autopsy concluded that Boyer had been strangled and had died around midnight.

On September 5, 1993, Jervis was charged by information with Boyer's murder. The State's case against Jervis was largely circumstantial and included the following evidence: (1) an envelope, pencil and pen Boyer had been carrying in her purse were found in Jervis's trash can outside his apartment; (2) Boyer's driver's license and her daughter's library card were found in Jervis's car; and (3) DNA evidence established a strong likelihood that a blood stain on Jervis's shirt and a pubic hair found on his pants were Boyer's. Several witnesses also testified as to Jervis's whereabouts on the night in question. The jury was unable to reach a verdict in Jervis's first trial in 1994. The State retried Jervis in 1995 and a second jury convicted him. Jervis appeals. We have jurisdiction under Indiana Appellate Rule 4(A)(7).

## I. Evidentiary Issues

Jervis challenges the admission of several pieces of evidence. These rulings are reviewed for an abuse of discretion. *Willoughby v. State*, 660 N.E.2d 570, 580–81 (Ind. 1996).

### A. *The shotgun.*

■ Jervis argues that a shotgun police found in his apartment should not have been admitted because it was irrelevant and tended to inflame the jury. The State responds that the evidence was relevant because Jervis testified that he did not know where the Newburgh Cinema was. Witness Bradley Chase worked at a pool hall near the Cinema. Chase stated that prior to the date of the murder Jervis had come to the pool hall with a shotgun for Chase to repair. Even though there was no evidence suggesting a shotgun played any role in the murder, the State contends the shotgun was admissible to bolster Chase's testimony that Jervis had been to the pool hall; thus, contrary to his own testimony, Jervis had to have known the location of the Cinema. The trial court admitted the shotgun for the limited purpose of corroborating that a meeting between Chase and Jervis at the pool hall had in fact occurred.

We agree with Jervis that the shotgun should not have been admitted but hold that the error was harmless. The shotgun in this case was not needed to corroborate Chase's testimony because Jervis did not dispute that he had taken a shotgun to the pool hall for Chase to repair it. As a result, the shotgun was unnecessary to the State's case. In this regard, this case is similar to two recent decisions from this Court dealing with the admission of a gun not used in the crime charged. In *Heavrin v. State*, 675 N.E.2d 1075 (Ind.1996), *reh'g denied*, the defendant was convicted of murder under facts also suggesting strangulation. A handgun the victim had reported missing from her home one month before her death was admitted into evidence for the limited purpose of showing that the defendant had the ability to enter the victim's home undetected. The defendant had somehow obtained the gun prior to the murder and sold it to his uncle. We held that admitting the gun was error on two grounds: relevance and prejudicial impact. The gun was not "salient" evidence because the defendant did not dispute being in the victim's home on the night in question. *Id.* at 1084.

■ In *Heavrin*, we concluded that the gun's probative value was outweighed by its prejudicial impact because its admission suggested the defendant had stolen it, a crime not at issue in the case. However, we deemed the error harmless because (1) the gun was cumulative evidence; (2) the jury was given a limiting instruction; and (3) the gun was unrelated to the murder itself. *Id.* *Tynes v. State*, 650 N.E.2d 685 (Ind.1995) dealt with similar issues. That case held that admitting two guns not used in the crime was harmless error because the irrelevant evidence was cumulative. *Id.* at 687–88. Jervis's shotgun, although error, was even less prejudicial than the guns in these two

cases. It was cumulative of properly-admitted evidence, and unlike the gun in *Heavrin* did not suggest another uncharged crime. Accordingly, the error was harmless and does not rise to the level required for reversal under Indiana Evidence Rule 403 due to its possible prejudicial impact on the jury.[2]

### B. *Statements against penal interest.*

■ In an effort to pin the murder on someone else, Jervis challenges the admission and exclusion of testimony related to the possible involvement of others in the crime. An admissibility hearing was held outside the presence of the jury to determine whether to admit testimony purportedly showing that Tony Floyd, who did not testify at trial, may have committed the murder. In an offer to prove, Jervis called Marilyn Molinet, who worked with Floyd at an apartment complex in Newburgh around the time of the murder. She testified that on the morning after Boyer's body was found, Floyd told her at work that he had gone out "partying" two nights earlier (the same night Boyer was killed), picked up a woman at Frenchie's, gone "riding around" with her, and then "dumped her off" behind Newburgh Cinema around 3 or 4 a.m. Molinet also testified that Floyd told her that he knew "the best way to kill a girl" and put his hands around his own neck to indicate strangulation, and that Floyd, who appeared to be "awful nervous," asked Molinet to be on the lookout for "detective cars." Floyd did not refer to Boyer by name. In the offer to prove, Jervis specifically declined the opportunity to present further evidence on Floyd's alleged involvement and did not contend that the woman Floyd allegedly picked up necessarily was Boyer. The trial court, without explanation, ruled Molinet's testimony to be inadmissible.

Floyd's statements to Molinet were clearly hearsay and therefore inadmissible unless within an exception to the hearsay rule. Jer-

vis contends that the statements were admissible under Indiana Evidence Rule 804(b)(3) as "statements against interest." The State responds that Jervis did not establish that Floyd was unavailable (a requirement for admission under the rule) or that Floyd's statements were sufficiently incriminating to come within the Rule 804(b)(3) exception.[3] This case presents the first opportunity for this Court to put judicial flesh on the bones of Rule 804(b)(3). The parties focus their arguments on the extent to which a statement against penal interest must have "so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Ind. Evidence Rule 804(b)(3). The State contends a statement against penal interest must be incriminating on its face to be admissible under this exception. Jervis, by contrast, essentially argues that it is sufficient if the statement merely arouses some suspicion as to culpability in the factual context of the case. We agree with the State that the trial court was within its discretion in rejecting this evidence. The statements attributed to Floyd did not constitute an admission of a crime. In and of themselves they did not even "tend to subject" Floyd to criminal liability. At most, they cast suspicion on Floyd when paired with other information that may or may not have been known to Floyd. This case illustrates a number of factors that may bear on the admission of a statement against interest. Floyd, according to Molinet, was "weird." Without explication, this observation could lead to the conclusion that in her judgment Floyd was a potential murderer, merely prone to exaggeration and inappropriate comments, or many other things. These factors leave open to question whether Floyd was a "reasonable person" hypothesized by Rule 804(b)(3) and whether he "would not have made the statement unless believing it to be true." And, of

---

2. It is not clear from the record that the shotgun was actually the same gun Chase repaired at the pool hall for Jervis. Nor are we directed to a limiting jury instruction. These factors, however, do not change our conclusion that admitting the gun was harmless error.

3. Molinet stated that she had "heard" that Floyd was dead but no admissible evidence and cer-

tainly no conclusive proof on this point was offered. We assume without deciding that Floyd was in fact unavailable and hold, for the reasons explained, that the trial court did not abuse its discretion in rejecting Molinet's testimony on this point.

course, the statement itself—particularly the assertion that Floyd "dumped her off"—includes a denial of complicity in any crime.

■ In construing the federal statement against interest exception recently in *Williamson v. United States*, 512 U.S. 594, 603–04, 114 S.Ct. 2431, 2436–37, 129 L.Ed.2d 476, 485 (1994), the U.S. Supreme Court staked out a position closer to that Jervis urges us to adopt here:

> [W]hether a statement [against interest] is self-inculpatory or not can only be determined by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest.... And other statements that give the police significant details about the crime may, also depending on the situation, be against the declarant's interest.

However, the Indiana rule is not the same as its federal analog and raises somewhat different considerations.[4] Indiana has removed the requirement of corroborative evidence. *See* note 5 *infra.* Accordingly, for the same reasons courts in this state have historically viewed such declarations with suspicion,[5] trial courts should be alert to evaluate the overall reliability of the proffered statement. Reliability is, after all, the ultimate justification for admission of statements against interest. At the end of the day, the statements by Floyd here were uncorroborated, only marginally against penal interest, and only marginally relevant. To be meaningful at all, the statements require the inference that Floyd knew of the fact of the murder and that it was accomplished by strangulation.[6] That may well be the case because these factors may well have been common knowledge in this small community by the day after the discovery of the body. Nevertheless, the degree to which the statement was against Floyd's interest was debatable. That Floyd said he picked up a woman and "dumped her off" near the site where the body was found is as consistent with concern that he might wrongfully become a suspect as it is with any sinister conclusion. We agree with Justice Kennedy's observation in *Williamson* that trial judges "are close to the facts and far better able to evaluate the various circumstances than an appellate court, [and] therefore must be given wide discretion to examine a particular statement to determine whether all or part of it should be admitted."[7] *Williamson*, 512 U.S. at 621, 114 S.Ct. at 2445, 129 L.Ed.2d at 496 (Kennedy, J., concurring in the judgment). In light of all the ambiguities as to unavailability, rele-

4. When the rules are not identical the factors favoring consistent interpretation with other jurisdictions do not apply. *Cf. Yamobi v. State*, 672 N.E.2d 1344, 1347 n. 4 (Ind.1996).

5. Until recently, Indiana steadfastly adhered to the common law's traditional distrust of statements against penal interest. *See, e.g., Taggart v. State*, 269 Ind. 667, 670, 382 N.E.2d 916, 918 (1978) (perceiving "good reasons for distrusting and disfavoring" statements against penal interest and declining to abandon distinction between these and declarations against pecuniary interest). The main concern with declarations against penal interest has been that they encourage perjured and fraudulent third-party confessions aimed at exonerating the accused. However, we adopted Federal Rule of Evidence 804(b)(3) as the law of Indiana in *Thomas v. State*, 580 N.E.2d 224 (Ind.1991). In so holding, *Thomas* reasoned that the federal rule "serves to assure a defendant his due process right to present evidence in his favor while protecting the trial court's ability to exclude evidence that is irrelevant or insufficiently trustworthy." *Id.* at 226. The Indiana Rules of Evidence have since been adopted and superseded decisions such as *Thomas*. The Indiana rule differs in some re-

spects from its federal counterpart. Notably the federal rule adopted in *Thomas* deems the statement inadmissible "unless corroborating circumstances clearly indicate the trustworthiness of the statement." Fed.R.Evid. 804(b)(3). The lack of a similar requirement in the Indiana rule, as the Court of Appeals noted in *Davis v. State*, 635 N.E.2d 1117, 1121 (Ind.Ct.App.1994), renders unclear what indicia of trustworthiness, if any, must be found for the statement to be admitted. We leave this issue for another day because resolution of this appeal does not turn on the existence or lack of corroborating circumstances.

6. Without knowledge of Boyer's death, Floyd could not have believed his statements to be inculpating. "If the declarant does not believe the statement to be against his interest, the rationale for the exception fails." 4 Weinstein's Evidence ¶ 804(b)(3)[02], at 804–147 (1996) (collecting cases).

7. Justice Kennedy was addressing specifically whether statements surrounding and part of a declaration against interest should be admitted. However, the logic and force of his point applies equally to whether the statement as a whole should be excluded.

vance and whether it was indeed contrary to Floyd's interest, Floyd's statements, although suspicious in context, were not sufficiently incriminating to render their rejection an abuse of discretion by the trial court.[8]

### C. DNA tests.

■ At some point police recovered the shirt and pants Jervis wore on the night of the murder. A blood spot on the shirt was submitted to DNA testing to determine whether it was Boyer's blood. The State presented evidence showing a strong likelihood, based on the results from these tests, that this was the case. Two DNA lab tests were performed. The first, called "DQ Alpha" testing, concluded based on the DNA extracted from the blood spot that the genetic "typing" of the blood matched Boyer's typing, did not match Jervis's, and was found in only 10.9% of Caucasians. The first jury nonetheless refused to convict based on this and the other evidence presented. The second test, using "poly marker" analysis, was conducted after the first trial. This test also found a genetic "match" between the blood spot on Jervis's shirt and Boyer's blood but to a much higher probability. The technician who performed the second test testified without contradiction that the markers the second test identified are independent of those identified by the first test. Accordingly, the probability of the first is appropriately multiplied by that of the second to determine the probability of the matches identified by both. The lab technician testified in the second trial that these combined results yielded a genetic match between Boyer's blood and the blood sample that is found in only one of every 2500 Caucasians.

Insofar as Jervis challenges the methodology and results of the DQ Alpha test, he has waived any error because he failed to object when the results were offered into evidence. *Harrison v. State,* 644 N.E.2d 1243, 1254 (Ind.1995), *aff'd after remand,* 659 N.E.2d 480 (Ind.1995), *reh'g denied, cert. denied,* 519 U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). However, Jervis interposed a timely objection to the poly marker analysis. He contends here that these results were unreliable because the lab technician who performed the tests testified at the first trial that the blood sample was too small for a more precise identification, and yet a stronger identification was somehow made in the poly marker test. His second claim is that the technician's testimony is inconsistent. Neither is persuasive. The technician testified in the first trial that the DNA sample was too small for a "RFLP" test. She reiterated this testimony in the second trial but explained that, unlike RFLP analysis, the poly marker did not require an additional extraction of DNA. Poly marker testing was not in use by her company at the time the DQ Alpha test was performed. And the technician was uncontradicted in testifying that there was enough DNA remaining from the DQ Alpha test to do the poly marker test. On the differences between RFLP and poly marker testing, the technician stated: "We're talking about comparing apples to oranges here." Thus, Jervis's premise that the blood sample was too small for both the DQ Alpha and poly marker tests fails. Nor is the technician inconsistent in testifying at the first trial that the DNA sample was too small for more precise identification under RFLP analysis, and testifying at the second trial that the same sample, examined under a different method not used in the first trial,

8. Jervis raises one other hearsay issue. A few weeks after the murder, witness David Brugger, while heavily intoxicated, boasted in the presence of several people that he killed Boyer and defecated in her mouth. A small amount of fecal matter was in fact found in Boyer's mouth. Brugger repudiated this statement at trial and denied committing the murder, explaining that he knew fecal matter was found in Boyer's mouth because a co-worker, Bryan Riedford, had told him this. Riedford, in turn, testified that an unidentified third party had told him that fecal

matter was found in Boyer's mouth. Jervis argues that Riedford's testimony on this point was hearsay and therefore inadmissible. This contention is without merit because the third party's statement to Riedford was not introduced to prove the truth of its contents. Evid.R. 801. Rather, Riedford's testimony about the statement was offered to show the basis of Brugger's knowledge. The fact it established was the fact that Riedford, who told Brugger, had been the recipient of this item of local gossip. As to that point, it is not hearsay.

could come up with 0.04% probability of error.

In *Harrison,* we noted that "DNA test results are not magic words which, once uttered, cause the doors of admissibility to open." *Harrison,* 644 N.E.2d at 1251 (internal quotation marks omitted). Although Indiana Code § 35–37–4–13(b), enacted in 1991, attempted to make DNA evidence per se admissible without an inquiry into whether it is scientifically reliable in a particular case, *Harrison* held that DNA testing, like any other evidence aided by expert testimony, must be offered in conformity with the Indiana Rules of Evidence. Specifically, the court must satisfy itself that the scientific principles upon which the expert testimony rests are reliable.[9] *Id.;* Evid.R. 702(b). Although the trial court did not make a reliability finding as such for the poly marker analysis, Jervis does not challenge the method's scientific reliability. The technician clearly explained the methodology used to perform the poly marker test and Jervis does not contend now, nor did he at trial, that this process itself was novel or untrustworthy. Rather, Jervis attacks an alleged "inconsistency" in the results. But no inconsistency arises just because the second test yielded more precise genetic data than the first. Obtaining more precise data was the point of doing the poly marker analysis in the first place. Accordingly, we see no abuse of discretion in admitting the poly marker test results.

### D. *Laboratory identification of cells.*

█ Jervis also alleges error in the admission of testimony about the contents of an oral swab taken from Boyer's mouth. Two lab technicians who analyzed the swab testified in both trials about its contents. At the first trial, the first technician stated that she "believed" the swab contained three sperm; the other "felt comfortable saying" he had found "one sperm head," but that "[t]his specimen definitely had few sperm present." After the first trial, the technicians viewed the sample under a more powerful micro-

scope, concluded that the substance was in fact not sperm, and testified to this effect in the second trial. The importance of the distinction was that Jervis contended he was incapable of producing sperm due to a vasectomy in 1990, a fact not known when the technicians testified the first time around.

Because the technicians had a plausible explanation for the apparent discrepancy, the trial court did not abuse its discretion in admitting their testimony and the physical evidence related to it. This does not appear to be a matter of "scientific principles" governed by Indiana Evidence Rule 702(b). Rather, it is a matter of the observations of persons with specialized knowledge. Jervis's challenge on this point amounts to no more than saying the technicians' second explanation was not worthy of belief. This is a jury argument and not a viable contention on appeal. Jervis's counsel vigorously cross-examined both technicians about the apparent inconsistency. The jury, therefore, was able to judge the technicians' credibility and accord their testimony whatever weight it deserved.

### II. Juror Dismissal

█ Finally, Jervis argues that the trial court erred in dismissing a juror from the case. Near the end of trial but before deliberations began, the bailiff informed the judge that a juror had told the bailiff during a lunch break that if the verdict did not turn out a "certain way" the juror "heard" there might be "problems" for the jury. The court questioned the juror, dismissed him over Jervis's objection after the juror expressed concern for his wife's safety, and replaced him with an alternate. Trial courts have significant leeway under Indiana Trial Rule 47(B) in determining whether to replace a juror with an alternate and we will reverse only if there was an abuse of discretion. *Harris v. State,* 659 N.E.2d 522, 525 (Ind.1995); *Ferry v. State,* 453 N.E.2d 207, 213 (Ind.1983). We defer substantially to trial judges on this point because they see jurors firsthand and are in a much better position to assess a

---

9. In this regard the Indiana rule governing expert testimony differs from its federal counterpart, which does not mandate a determination of reliability as such. *Cf. Daubert v. Merrell Dow* *Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (discussing requirements for admission of expert testimony under Federal Rules of Evidence).

juror's ability to serve without bias or intimidation and decide the case according to law. A defendant is entitled as a matter of right only to an impartial jury, IND. CONST. art. I, § XIII, and not to one of his precise choosing where the issue is merely replacing a regular juror with an alternate. *Whitehead v. State,* 500 N.E.2d 149, 153 (Ind.1986). Indeed, alternate jurors are presumed to be fair and equally qualified to the task. *French v. State,* 521 N.E.2d 346, 349 (Ind.1988). The trial court here justified its decision in a single sentence: "We try to keep the process as pure as we can." The juror in this case voiced concern about intimidation and Jervis makes no claim that the alternate was partial or biased. Not only was the decision to substitute the alternate not an abuse of discretion, but it may have foreclosed a third trial in this case by ensuring the jury's ability to render a verdict on the evidence. There was no error.

### Conclusion

The conviction of Mark Michael Jervis for the murder of Terri Jolene Boyer is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.