## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 24 2020, 10:00 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald J. Frew
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tracey L. Welling, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 24, 2020 <br><br> Court of Appeals Case No. <br> 19A-CR-2208 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Frances C. Gull, Judge <br><br> Trial Court Cause No. <br> 02D05-1803-F3-14 & 02D05-1603-F5-64 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Tracy Welling (Welling), appeals his conviction and sentence for one Count of attempted rape, a Level 3 felony, Ind. Code §§ 35-42-4-1(a)(1); 35-41-5-1; one Count of domestic battery, a Level 6 felony, I.C. § 35-42-2-1.3(b)(2); one Count of strangulation, a Level 6 felony, I.C. § 35-42-2-9(b)(1); and one Count of sexual battery, a Level 6 felony, I.C. § 35-42-4-8(a)(1)(A).

We affirm.

# ISSUES

Welling raises two issues on appeal, which we restate as the following:

(1) Whether the trial court abused its discretion by not removing a juror during Welling's trial after the juror disclosed to the bailiff that he knew a witness; and

(2) Whether Welling's sentence is inappropriate in light of the nature of the offenses and his character.

# FACTS AND PROCEDURAL HISTORY

On February 23, 2018, A.C. returned home from work between 9:00 and 10:00 p.m. and watched television while her four children, who were all under seven years old, were in their bedrooms sleeping. A.C. and Welling were romantically involved in the past, but they were no longer in a relationship. While watching television, A.C. and Welling were messaging each other on

social media. Welling asked A.C. if he could come over and A.C. sent a back a "thumbs-up emoji." (Transcript Vol. II, p. 157). When Welling arrived, A.C. thought that Welling was "acting weird," and she believed that Welling was under the influence of alcohol. (Tr. Vol. II, p. 169). They both watched television as they talked. Welling then began kissing A.C. and rubbing her body. A.C. rejected Welling's advances because Welling had a girlfriend. A.C. ordered Welling to leave her house, and Welling responded by violently choking A.C. A.C. lost consciousness several times, and during one of the times that she regained it, Welling was on top of her, and he had "stuck his penis in [A.C.'s] mouth." (Tr. Vol. II, p. 172). A.C. attempted to move her head back, but Welling resumed choking A.C.

[5] Welling subsequently grabbed A.C.'s hand and directed her to the bedroom where he got undressed. Welling attempted to get "into [A.C.'s] . . . panties," and he tried to put his fingers inside her vagina. (Tr. Vol. II, p. 171). A.C. informed Welling that she had a tampon inside her vagina and Welling called A.C. a liar. Because A.C. believed that Welling was trying "to have sex" with her, she used her hands to cover her "vagina, and then Welling just kept, like trying to move [her] hands" and they wrestled for a while. (Tr. Vol. II, p. 172). Welling was successful in putting the tips of his fingers inside A.C.'s vagina. Welling also choked A.C. in the bedroom. When she regained consciousness, A.C. could hear her children yelling in the background. Welling eventually left A.C.'s house. A.C.'s oldest son, J.G., who was five years old at the time, observed Welling choking A.C. J.G. locked the door when Welling left A.C.'s

house. A.C. thereafter contacted her family, who in turn, contacted the Fort Wayne Police Department. J.G. reported to the responding officers that he saw Welling pull A.C.'s hair and that he saw A.C. lose consciousness as a result of the choking.

[6] A.C. was subsequently taken to the Fort Wayne Sexual Assault Treatment Center, where she was examined by sexual assault nurse Shawn Callahan (Nurse Callahan). As part of the examination, Nurse Callahan recorded A.C.'s injuries. A.C. had red marks on the left side of her neck, a scratch between her breasts, and scratches on her shoulder. On the right side of A.C.'s neck, there was a heart-shaped red mark. Nurse Callahan also collected DNA swabs from several parts of A.C.'s body. Welling's DNA was found in the swabs taken from A.C.'s breast.

[7] Two days after the incident, A.C. went to the emergency room, and she complained of throat pain and pain at the base of her tongue. A scan revealed that A.C. had suffered an "incidental collapse of the vallecula" which is a "fold or recess of tissue located at the root of the tongue" that is designed to collect saliva. (Tr. Vol. II, p. 221).

[8] On March 1, 2018, the State filed an Information, charging Welling with Level 3 felony rape, Level 3 felony attempted rape, Level 6 felony domestic battery, Level 6 felony strangulation, and Level 6 felony sexual battery. On December 11, 2018, the State filed an additional Information, charging Welling with Level 1 felony rape.

[9] A three-day jury trial commenced on July 30, 2019. On the second day during lunch break, Juror 139, who was also a nurse, encountered Nurse Callahan in the hallway. They both recognized each other since they had worked together at "Towne House." (Tr. Vol. II, p. 249). When Juror 139 stated that she no longer worked there and had left three years ago, Nurse Callahan stated that she had heard about that, and Juror 139 inquired about Nurse Callahan's grandson. After Nurse Callahan informed Juror 139 that her grandson was doing fine, they both walked away. Shortly after that encounter, Juror 139 reported her interaction to the bailiff.

[10] When Welling's hearing resumed, the trial court conducted an individualized *voir dire* of Juror 139. After being sworn, Juror 139 testified that she was surprised to see Nurse Callahan at the courthouse, and she disclosed that she had previously worked with Nurse Callahan at the same place, but it had been "many years ago." (Tr. Vol. II, p. 248). Juror 139 additionally testified that although she was Facebook friends with Nurse Callahan, she did not have "an outside friendship" with her, even though she had liked a photo of Nurse Callahan's grandson. (Tr. Vol. II, p. 247). Juror 139 ultimately confirmed that her prior association with Nurse Callahan would not inhibit her ability to be fair and impartial. After the trial court questioned Juror 139, it admonished her not to speak to the other jurors about the incident. Juror 139 was then excused from the courtroom.

[11] The State was satisfied that Juror 139 would remain impartial, however, Welling's counsel challenged Juror 139's ability to remain impartial and

requested the trial court to remove her as a juror. The trial court denied Welling's request and it reconvened the trial. At the close of the evidence, the jury did not find Welling guilty of Level 1 and Level 3 felony rape, but it found Welling guilty of Level 3 felony attempted rape, Level 6 felony domestic battery, Level 6 felony strangulation, and Level 6 felony sexual battery. On August 30, 2019, the trial court conducted a sentencing hearing and sentenced Welling to consecutive terms of sixteen years for the Level 3 felony conviction, and two and one-half years for each of his three Level 6 felony convictions. Welling's aggregate sentence is twenty-three and one-half years.

[12] Welling now appeals. Additional information will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Removal of a Juror*

[13] Welling argues that he was denied the right to a fair trial because the trial court abused its discretion by denying his request to replace Juror 139 with an alternate juror during his trial. Article 1, Section 13 of the Indiana Constitution guarantees a defendant's right to an impartial jury. *May v. State*, 716 N.E.2d 419, 421 (Ind. 1999). Indiana Trial Rule 47(B) provides, in part, that "[a]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties." Trial courts have significant leeway under Trial Rule 47(B) in determining whether to replace a juror with an alternate. *Jervis v. State*, 679 N.E.2d 875, 881 (Ind. 1997). Trial courts see jurors firsthand

and are in a much better position to assess a juror's ability to serve without bias or intimidation and decide the case according to the law. *Id*. at 881-82. The standard of review regarding a trial court's decision to remove a juror after a trial has begun is abuse of discretion. *Scott v. State*, 829 N.E.2d 161, 167 (Ind. Ct. App. 2005). The court abuses its discretion when its decision is "clearly against the logic and effect of the facts and circumstances before the court." *Vaughn v. State*, 971 N.E.2d 63, 68 (Ind. 2012).

[14] In the present case, after potential jury members were selected, the trial court read out the names of witnesses, including Nurse Callahan's, who may be involved in the case and asked the jury if they recognized any of them. Juror 139 did not recognize Nurse Callahan as a person she knew. During the second day of Welling's jury trial, Juror 139 met Nurse Callahan in the hallway. Juror 139 was surprised to see Nurse Callahan in the courthouse, and after exchanging pleasantries, which did not include a discussion of the facts surrounding the trial, the two parted ways. Juror 139 immediately disclosed her interaction to the bailiff.

[15] After the trial court was informed of Juror 139's interaction with Nurse Callahan, it conducted a *voir dire* of Juror 139. Juror 139 testified that she had worked with Nurse Callahan many years ago. Juror 139 added that she did not have an "outside friendship or anything" with Nurse Callahan, but she had liked a picture of Nurse Callahan's grandson on Facebook since she had also worked at the same place as Nurse Callahan's son. (Tr. Vol. II, p. 248). Juror 139 added that she "had no idea" Nurse Callahan would be at Welling's trial,

and she was "kind of surprised" to see her in the courthouse. (Tr. Vol. II, p. 249). When asked to disclose the extent of her conversation with Nurse Callahan, Juror 139 testified as follows:

> I just told her hi . . . we worked [together] at Towne House and I said, "Oh, no, I don't work there anymore. I left three years ago." And she goes, "Oh, yeah, I heard about that." And then I said, "Well, how's your grandson doing?" And she said, "Fine." And then we walked away.

(Tr. Vol. II, p. 249). Juror 139 added that she was not aware that she was having a conversation with a witness in the case. Juror 139 denied talking about any facts regarding the case. The trial court concluded its inquiry by asking whether Juror 139's past working relationship and Facebook friendship with Nurse Callahan would affect her ability to remain fair and impartial as to all the testimony she would hear. Juror 139 stated that her prior connection with Nurse Callahan "wouldn't skew" her ability to remain neutral. (Tr. Vol. II, p. 249). Welling's counsel further explored the nature of Juror 139 and Nurse Callahan's working relationship. Juror 139 reiterated that it was many years ago since she last worked with Nurse Callahan, and while she and Nurse Callahan had worked at the same place, they were stationed in different departments.

[16] Our supreme court has addressed claims of bias in cases involving casual relationships between a juror and a witness. In *Woolston v. State*, 453 N.E.2d 965, 968 (Ind. 1983), our supreme court held that the trial court did not abuse its discretion in refusing Woolston's request to remove a juror because of his

mere familiarity with a witness. In that case, one of the jurors informed the court that an expert witness—a doctor who had testified regarding the defendant's insanity defense—had treated the juror's father and that the juror "had little respect for the doctor." *Id*. Still, the juror stated that he would try to treat the doctor's testimony the same as that given by any other witness. *Id*. The trial court concluded that the juror could be fair and impartial. *Id*. Our supreme court found no abuse of discretion because there was no evidence in the record that the "defendant was placed in substantial peril" by the juror's relationship with a witness. *Id*.

[17] In *Alvies*, a juror named Carr told the trial court that she knew Dudley, the coroner who was testifying as a witness in the case, because Dudley had installed carpeting in Carr's home. *Alvies*, 795 N.E.2d at 502. Our court noted that a juror's familiarity with a witness does not necessarily constitute bias. *Id*. Finding the relationship even less problematic than the one found in *Woolston*, our court said,

> Indeed, unlike Carr, the juror in *Woolston* affirmatively stated that he did not respect the witness but, nevertheless, indicated that he would be fair and impartial. Carr gave no indication that she had any opinion of Dudley in his capacity as Coroner and, instead, made it clear that her knowledge of Dudley would not affect her ability to serve as a juror. Again, we must conclude that the court did not abuse its discretion when it denied Alvies' motion to remove Carr.

*Id*. at 502-03.

[18] Here, we likewise find no abuse of discretion in the trial court's denial of Welling's request to remove Juror 139 from the jury panel. As in *Alvies* and *Woolston*, by asking its own questions and allowing Welling's counsel to ask Juror 139 questions, the trial court properly analyzed the potential bias and considered the nature of Juror 139's connection to Nurse Callahan and any indications of partiality. *See Alvies*, 795 N.E.2d at 500. Juror 139's responses indicated that she had not formed an opinion regarding Welling's guilt or innocence and would base her decision solely on all the evidence presented. *See Alvies*, 795 N.E.2d at 500. In addition, Juror 139's testimony regarding her relationship with Nurse Callahan showed that any connections she had with Nurse Callahan was attenuated by the fact that it had been many years since they had both worked at the same place. In fact, Juror 139 added that while she and Nurse Callahan had worked at the same place, they had been assigned in different departments, and she had no close relationship with Nurse Callahan, other than being a casual friend on Facebook.

[19] Here, the trial judge was in the best position to weigh the evidence and observe Juror 139's demeanor while making the determination that Juror 139 could remain impartial. *Jervis*, 679 N.E.2d at 881. Thus, we hold that the trial court's refusal to replace Juror 139 with an alternate was not an abuse of discretion.

## II. *Inappropriate Sentence*

[20] Welling contends that his aggregate twenty-three and one-half year sentence is inappropriate considering the nature of the offenses and his character. Indiana Appellate Rule 7(B) empowers us to independently review and revise sentences

authorized by statute if, after due consideration, we find the trial court's decision inappropriate in light of the nature of the offense and the character of the offender. *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007). The "nature of offense" compares the defendant's actions with the required showing to sustain a conviction under the charged offense, while the "character of the offender" permits a broader consideration of the defendant's character. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008); *Douglas v. State*, 878 N.E.2d 873, 881 (Ind. Ct. App. 2007). An appellant bears the burden of showing that both prongs of the inquiry favor a revision of his sentence. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case. *Cardwell*, 895 N.E.2d at 1224. Our court focuses on "the length of the aggregate sentence and how it is to be served." *Id*.

[21] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012). In the instant case, Welling was found guilty of Level 3 felony attempted rape, Level 6 felony domestic battery, Level 6 felony strangulation, and Level 6 felony sexual battery. The sentencing range for a Level 3 felony is three to sixteen years, with an advisory sentence of nine years. I.C. § 35-50-2-5. A Level 6 felony has a sentencing range of six months to two and one-half years, with an advisory sentence of one year. I.C. § 35-50-2-7. The trial court imposed maximum sentences of sixteen years for his Level 3

felony conviction, and two and one-half years for each of his Level 6 felony convictions. Welling's sentence is an aggregate sentence of twenty-three and one-half years.

[22] The nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation. *Croy v. State*, 953 N.E.2d 660, 664 (Ind. Ct. App. 2011). After A.C. invited Welling to her home and while the two were watching TV, he began kissing her. A.C. rejected Welling's sexual advances and Welling responded by violently choking A.C. multiple times causing her to lose consciousness. When she regained consciousness, Welling was on top of her and he had put his penis inside her mouth. Welling then moved A.C. to the bedroom and after he got undressed, he attempted to penetrate A.C.'s vagina with his fingers. A.C. tried to use her hands to cover her vagina and otherwise fight him off. A.C. remembered hearing her minor children yelling in the background. Eventually, Welling left A.C.'s house. A.C.'s oldest son, J.G., who was five years old at the time of the attack, informed the responding officers that he saw Welling pull A.C.'s hair, and A.C. lose consciousness.

[23] With respect to Welling's character, at the time of his sentencing, Welling was only twenty-eight years old and had a limited criminal history. In *Reis v. State*, 88 N.E.3d 1099, 1105 (Ind. Ct. App. 2017), we held that "[e]ven a minor criminal record reflects poorly on a defendant's character." (citations omitted). As a juvenile, Welling had been adjudicated as a delinquent for conversion, and as an adult, he accumulated two convictions, *i.e.*, Class A misdemeanor

carrying a handgun without a license in 2014, and Level 5 felony carrying a handgun without a license with a prior conviction in 2016. Further, we note that at the time he committed the instant offenses, Welling was on probation for the Level 5 felony conviction. In addition, Welling's behavior demonstrated a repeated casual disregard for the law. In the presentence investigation report, Welling confessed that he used marijuana on a daily basis, and that he also used synthetic marijuana for a period of two years.

[24] Under the circumstances, Welling failed to persuade this court that his aggregate twenty-three and one-half years is inappropriate in light of the nature of the offenses and his character. Accordingly, we decline to disturb the sentence imposed by the trial court.

## CONCLUSION

[25] Based on the foregoing, we conclude the trial court did not abuse its discretion by not removing Juror 139 from the panel. Also, we conclude that Welling's sentence is not inappropriate in light of the nature of the offenses and his character.

[26] Affirmed

[27] Baker, J. and Brown, J. concur