

**FILED**

Apr 29 2015, 9:03 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Jennifer M. Lukemeyer
Tyler D. Helmond
Voyles Zahn & Paul
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Leandrew Beasley,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | April 29, 2015<br><br>Court of Appeals Case No.<br>49A02-1406-CR-382<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Kurt M. Eisgruber,<br>Judge<br><br>Cause No. 49G01-1210-MR-67593 |

**Brown, Judge.**

[1] Leandrew Beasley appeals his convictions for murder, attempted murder, a class A felony, and unlawful possession of a firearm by a serious violent felon, a class B felony. Beasley raises four issues, which we consolidate and restate as:

I. Whether the trial court abused its discretion when it admitted certain statements as statements against interest and admitted testimony of a police officer regarding a victim's statement made to him minutes after the incident;

II. Whether the trial court committed fundamental error by not declaring a mistrial after an officer gave testimony not supported by her investigation and the court admonished the jury to disregard the testimony; and

III. Whether the trial court erred in denying his motion for mistrial regarding jury taint.[1]

We affirm.

### Facts and Procedural History

[2] At around 11:00 a.m. on August 3, 2012, James Allen drove with his girlfriend, Shantell Williams, to the home of his cousin, Gerald Beamon. Williams waited in the car while Allen went inside to speak with Beamon. Allen told Beamon that he had been involved in an altercation the night before with a man known as "Little Rock," who was later identified as Leandrew Beasley. Transcript at 350. According to Allen, also present during the altercation were men known

---

[1] Beasley also argues in his reply brief that "[t]he cumulative effect of the trial errors warrant reversal even if each may only be deemed harmless in isolation." Appellant's Reply Brief at 11. He did not raise this issue in his appellant's brief. Therefore, we do not address this argument. *See Carden v. State*, 873 N.E.2d 160, 162 n.1 (Ind. Ct. App. 2007) (holding that an issue not raised in an appellant's brief may not be raised for the first time in a reply brief).

as Levi, Little Billy, and Little Rock's brother, known as "J Rock" and later identified as James Beasley ("James"). *Id.* at 351. Allen stated that they were in a garage when he noticed Beasley reach for a gun in his waist band, and Allen reached for the gun, punched Beasley, and struggled for control of the gun. Allen also told Beamon that during the struggle, the gun went off and Beasley was shot in the face. Then, Allen said, the gun would not fire anymore, and he pushed Beasley and ran away.

[3]   Allen asked Beamon to help him move some of his belongings from his home to Williams's apartment. Williams drove them to the home of a friend of hers where they changed cars, and afterwards they drove to Allen's house to pick up his belongings. Beamon saw that Allen's home had been ransacked. They then returned to the friend's house to switch back to the original car. While Williams was inside the friend's house, Allen showed Beamon some photographs that had been taken of people at a club a few weeks earlier. Allen identified in the pictures the people "he got into it with" the night before by pointing to them in a photograph later admitted into evidence at trial as State's Exhibit 6. *Id.* at 370. Beamon looked at the pictures for "[a]bout ten minutes" and handed them back to Allen. *Id.* at 372.

[4]   Williams then drove the three of them to her apartment on Emerson Avenue near 39th Street on the east side of Indianapolis, parked near a common entrance to the building, and Williams went inside. Allen removed his belongings from the car and set them on the sidewalk while Beamon sat in the rear seat on the driver's side with the door open. As Beamon was about to exit

the car, he heard at first a sound like firecrackers coming from behind the car, heard the sound of loud gunfire, and saw three men walking toward the front of the car and shooting at them. Beamon recognized two of the men from the pictures that Allen had shown him as Little Rock and J Rock.

[5] Before exiting the vehicle, Beamon was shot in the stomach and leg. Despite the gunshots, he managed to run south on Emerson and conceal himself near some bushes in front of one of the apartment buildings. He took off his belt to use as a tourniquet on his arm and then called 911 on his cell phone. When police cars arrived, Beamon walked onto Emerson Avenue, flagged down a squad car, and told the Indianapolis Metropolitan Police Officer Nick Gallico that Little Rock and J Rock shot him. Allen was killed by the gunfire.

[6] At the hospital the next day, Beamon gave a statement to Detective Leslie VanBuskirk and identified Beasley as Little Rock and James as J Rock as participants in the shooting from photo arrays.[2] After the interview, Detective VanBuskirk retrieved the photographs that the coroner had recovered from the right front pocket of Allen's pants, made blowups of them, and returned to the hospital to show them to Beamon. Beamon identified Little Rock and J Rock in one of the blowups later admitted as State's Exhibit 178, which was a blowup of State's Exhibit 6. Detective VanBuskirk also conferred with Detective John

---

[2] Detective VanBuskirk testified at trial that she prepared photo arrays of Beasley and James based upon Beamon's statements to officers at the crime scene that he had been shot by Little Rock and J Rock.

Green, who had interviewed Beasley on August 2, 2012, after Beasley went to Methodist Hospital to receive treatment for a graze gunshot wound to his face.

[7] On October 17, 2012, the State filed initial informations against Beasley and James, which, as subsequently amended, charged Beasley and James with Count I, murder; Count II, attempted murder as a class A felony; and Count III, battery as a class C felony. Beasley was also charged under Count IV with unlawful possession of a firearm by a serious violent felon. On January 27, 2013, following a traffic stop in which a high-speed chase and subsequent foot chase ensued, Beasley was apprehended. On October 30, 2013, Beasley filed a motion in limine which, in relevant part, sought to exclude as hearsay the statements made by Allen to Beamon, along with a memorandum in support of the motion. James, who was tried jointly with Beasley, filed a similar motion the same day. On November 20, 2013, the State filed its response to the motions in limine, and, following a hearing on the motions, filed a second response on January 10, 2014. The court held another hearing on the motions on February 6, 2014, and on February 21, 2014, issued an order denying them. In the order, the court found that the statements were admissible under Ind. Evidence Rule 804(b)(3) as statements against interest.

[8] A jury trial commenced on April 14, 2014, in which evidence consistent with the foregoing was presented. At the outset of trial, the court denied a defense motion to reconsider the denial of the motions in limine. The court also overruled at trial defense counsel's objections to the admission of the evidence. Beamon testified regarding what Allen had told him about the altercation of

August 2, 2012, and he identified, based on his perceptions at the scene, Beasley and James as two of the shooters on August 3, 2012. When asked to describe the moment when he witnessed the shooters approaching the vehicle, Beamon testified that "[i]t was messed up because after lookin at the pictures and then you look up and you see the people right before your eyes that was in the picture you like wow and it . . . messed me up . . . it was surreal." *Id.* at 572. He also indicated that his identification of the shooters was not "just a particular feature of the picture" and instead "was body type and face and hair and the way they were shaped . . . ." *Id.* at 573. Also, regarding the August 2, 2012 altercation, Officer Jeremy Lee testified that he interviewed Beasley that evening at Methodist Hospital, where he was being treated for a graze wound to the face, and that Beasley told Officer Lee he was shot by an unknown assailant as he was walking on the sidewalk near 25th and Hillside. Detective Green testified that he interviewed Beasley later that night at police headquarters in which he repeated a similar version of events.

[9] Officer Gallico testified over objection that, after Beamon flagged him down at the scene, Beamon told him that he was shot by Little Rock and J Rock. Also, Detective VanBuskirk was asked about a photo array she prepared which was marked as State's Exhibit 9 and featured a photograph next to which Beamon had written "AK" and "75-80%" in the margin. State's Exhibit 9. Detective VanBuskirk subsequently testified that the person identified by Beamon was named "Melvin Beasley" and that she "believe[d] it's a cousin or an uncle" of the codefendants. *Id.* at 836. Beasley's counsel was allowed to *voir dire*

Detective VanBuskirk, and she admitted that she did not have any firsthand knowledge of Melvin Beasley. The court admonished the jury to strike her testimony regarding Melvin Beasley's relation to the codefendants.

[10] On April 17, 2014, the court granted a defense motion for a directed verdict on Count III, which pertained to both defendants. During deliberations, the jury submitted the following question to the court: "One of the jurors is concerned for their safety and well-being because they recognize someone in the gallery and that is influencing their decision, is there any assurance of safety we can give this juror?" Appellant's Appendix at 145. The court ordered the jury to stop deliberations and proceeded to interview each juror, beginning with the juror having the issue, Juror No. 9. Juror No. 9 told the court that she "interacted with" the person "awhile back and [] knew their face," and she believed she would "see them again or interact with them again." Transcript at 949. She stated that she saw the person that day after lunch, that during deliberations she could not decide on a verdict, and that when she was asked why she "expressed [her] opinion" she stated that she was concerned for her safety. *Id.* at 950. She also said that there was "[v]ery little" discussion about the issue and that she did not believe that her discussions had an influence on the jury. *Id.* She said that she "thought [her] safety might be jeopardized if [she] were not to return the right verdict" because she was "acquainted with the kind of people that they were," referring to persons associated with the defendants. *Id.* at 954.

The court proceeded to individually question the rest of the empaneled jurors, and each juror assured the court that the statements by Juror No. 9 would not influence their deliberations. Specifically, Juror No. 2 stated that the concerns expressed by Juror No. 9 did not affect how he/she[3] viewed the case and that "it's a personal concern for her." *Id.* at 959. Juror No. 5, when asked whether the concerns expressed by Juror No. 9 would have an effect, stated "[n]o, absolutely not," that it did not change his/her "perspective in any way" and that, other than with respect to Juror No. 9, it would not change the other jurors' "ability to deliberate or their perspective." *Id.* at 964. Juror No. 6 stated that the other jurors were "just showing concern for [Juror No. 9] really." *Id.* at 967. Juror No. 10 stated: "I do not think it changed anyone's verdict." *Id.* at 974.

After speaking with the jurors individually, the court stated that it thought Juror No. 9 would be removed, but "[b]ased on every jurors' response, I'm satisfied that the rest of the jury's not tainted and I believe we can substitute alternate one in for" her. *Id.* at 981. Counsel for Beasley moved for a mistrial, and James's counsel joined in that request. The court denied their motion, reiterating that it did not believe the integrity of the jury had been compromised, and ruled that it would remove Juror No. 9 and replace her with Alternate Juror No. 1. After replacing Juror No. 9, the court admonished the

---

[3] The transcript does not indicate the gender of Jurors No. 2 or 5.

jury as follows: "We have replaced juror number nine with the first alternate juror. The reasons for the removal of juror nine and her replacement by the alternate juror number one need not be discussed and I'd admonish you from discussing any of the – the rationale behind that." *Id.* at 988.

[13] The jury found Beasley guilty on Counts I and II.[4] Beasley subsequently waived his jury trial right on Count IV. On May 9, 2014, the court found Beasley guilty on Count IV. That same day, the court held a sentencing hearing and sentenced Beasley to fifty-five years for Count I, murder, twenty years for Count II, attempted murder, and ten years on Count IV, and ordered Counts I and II to be served consecutively and Count IV to be served concurrently with Count I.

## *Discussion*

### I.

[14] The first issue is whether the trial court abused its discretion when it admitted certain statements made by Allen regarding an altercation the night before he was killed as statements against interest, and when it admitted testimony of Officer Nick Gallico regarding Beamon's statement made to him minutes after the incident that he was shot by Little Rock and J Rock. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of

---

[4] James was similarly found guilty on each count.

discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied, trans. denied*.

[15] We address separately Beasley's arguments regarding: (A) Allen's hearsay statements; and (B) Officer Gallico's testimony.

A. *Allen's Hearsay Statements*

[16] Beasley argues that "[m]ost cases involving the statement against interest exception involve statements made by informants to police officers or confessions by a third party to police officers regarding the crime being charged." Appellant's Brief at 10. He argues that "[t]he statement did not expose Allen to criminal liability" because "it was made to a close friend, Beamon, and not to a law enforcement officer or someone Allen did not trust to keep his confidences." *Id.* at 11. He also asserts that "the self-defense justification of the claim eliminates any potential criminal exposure." *Id.* Beasley further suggests that "the reliability of the statement is questionable" in that Allen and Beamon "were close friends," Beamon was similarly shot and witnessed Allen's killing, and "[i]t is not farfetched to believe a person could inadvertently misconstrue or misremember a statement made by a close friend who was killed in his presence shortly thereafter," as well as that "what Allen

told him is tainted by the bias Beamon has for his deceased friend." *Id.* Beasley also argues that the reliability of Allen's statements "is gutted by his girlfriend's claim that she was with Allen during the time frame in which [Beasley] was shot in the face . . . ."[5] *Id.* at 12.

[17] The State argues that "[a] statement against the declarant's penal interest is one that *tends* to subject the declarant to criminal liability such that a reasonable person would not have made it unless he believed it to be true." Appellee's Brief at 11. It maintains that Allen's statement to Beamon regarding the first altercation "clearly would have exposed [him] to penal consequences had the defendants reported it to the police rather than seeking personal vengeance." *Id.* It states that "Allen's rendition of the altercation might well have provided a self-defense claim, [but] that does not equate with no criminal consequences because he could have been charged and would then have to defend himself . . . ." *Id.* at 14. The State also argues that "any error in the admission of Allen's statement to Beamon was harmless in light of the fact that Beamon clearly and unequivocally identified [Beasley] and [James] as two of the shooters that he personally observed." *Id.* at 15.

[18] Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Ind.

---

[5] Williams testified that on August 2, 2012, Allen picked her up from work "around 4 or 5" pm, she later "dropped him off somewhere," and she "came back to get him like 9 or 10." Transcript at 681. Officer Jeremy Lee testified that he was dispatched to Methodist Hospital to meet with Beasley at approximately 8:30 p.m.

Evidence Rule 801(c). Hearsay is inadmissible unless admitted pursuant to a recognized exception. Ind. Evidence Rule 802; *see also Blount v. State*, 22 N.E.3d 559, 565 (Ind. 2014) ("Hearsay is an out-of-court statement offered for the truth of the matter asserted, and it is generally not admissible as evidence.") (internal citations and quotations omitted).

[19] The parties do not dispute that the testimony given by Beamon regarding Allen's statements were admitted for the truth of the matter asserted: that Beasley drew a gun on Allen and a fight ensued, resulting in Beasley being wounded in the cheek when a gunshot grazed it. The court admitted Beamon's testimony regarding the statements made to him by Allen under Ind. Evidence Rule 804(b)(3) as statements against interest. That rule provides that if a declarant is unavailable as a witness, the court may admit

> [a] statement that a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability.

[20] In *Jervis v. State*, the Indiana Supreme Court examined the application of the statement against interest exception where defendant Jervis sought to introduce the testimony of Marilyn Molinet to show that not he but another person, Tony Floyd, murdered Terri Boyer. 679 N.E.2d 875, 878-880 (Ind. 1997). The court held an admissibility hearing outside the presence of the jury in which Molinet

testified that on the morning after Boyer's body was found, Floyd told her at work that he had gone out "partying" two nights earlier (the same night Boyer was killed), picked up a woman at Frenchie's, gone "riding around" with her, and then "dumped her off" behind Newburgh Cinema around 3 or 4 a.m. Molinet also testified that Floyd told her that he knew "the best way to kill a girl" and put his hands around his own neck to indicate strangulation, and that Floyd, who appeared to be "awful nervous," asked Molinet to be on the lookout for "detective cars." Floyd did not refer to Boyer by name.

*Id.*

[21] The Court observed that the focus of the parties' arguments centered "on the extent to which a statement against penal interest must have 'so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,'"[6] that the State contended such "a statement against penal interest must be incriminating on its face to be admissible under this exception" and that "Jervis, by contrast, essentially argue[d] that it is sufficient if the statement merely arouses some suspicion as to culpability in the factual context of the case." *Id.* The Court agreed with the State that the trial court "was within its

---

[6] At the time of *Jervis*, Ind. Evidence Rule 804(b)(3) stated in relevant part:

> *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. . . .

We find the language in the previous rule regarding a statement which "so far tended to subject the declarant to civil or criminal liability" to be substantially similar to the current language contemplating a statement which "had so great a tendency to . . . expose the declarant to civil or criminal liability."

discretion in rejecting" the proffered evidence, holding that such statements "did not even 'tend to subject' Floyd to criminal liability" and "[a]t most, they cast suspicion on Floyd when paired with other information that may or may not have been known to Floyd." *Id.* The Court also instructed trial courts to be "alert to evaluate the overall reliability of the proffered statement," noting that "[r]eliability is, after all, the ultimate justification for admission of statements against interest." *Id.* The Court found that "[a]t the end of the day, the statements by Floyd [] were uncorroborated, only marginally against penal interest, and only marginally relevant." *Id.* It further noted that the record did not show that Floyd even knew a murder had occurred or that such murder was accomplished by strangulation, and it stated that, "[w]ithout knowledge of Boyer's death, Floyd could not have believed his statements to be inculpating," citing to a treatise for the proposition that, "[i]f the declarant does not believe the statement to be against his interest, the rationale for the exception fails." *Id.* at 879, 879 n.6 (quoting 4 WEINSTEIN'S EVIDENCE ¶ 804(b)(3)[02], at 804-147 (1996)).

[22] At trial, Beamon indicated that Allen told him "that he had been involved in an altercation the night before" in a garage with "Little Rock," in which "Levi . . . . Jay Rock and Little Billy" were also present. Transcript at 350-351. Beamon testified that as Allen "turned to bend and pick something up" he observed Beasley "reaching in his waistband" for a gun, and Allen "reached for it and they started strugglin over it." *Id.* at 351-352. Beamon also testified that Allen told him that Allen "stoled" Beasley, meaning that Allen "swung and punched

him," and as the two men fought for control of the gun it "went off and [Allen] shot Little Rock in the face." *Id.* at 352-353. Beamon further stated that Allen told him that soon after that shot fired, "the gun wouldn't fire anymore so he pushed [Beasley] and then started runnin." *Id.* at 353.

[23] As the Court observed in *Jervis*, the rationale for allowing statements against interest into evidence is that the declarant would only make such a statement if it were true because the content of the statement goes against the declarant's interests, and that this rationale fails if the declarant did not believe the statement *was* against his or her interest. The rules of evidence assume that such statements are reliable precisely because they are against the interest of the declarant. Here, none of the statements attributed to Allen are facially incriminating and rather suggest that Allen was forced to defend himself from an attack by Beasley after Allen bent down to pick something up. Indeed, even the trial court in its ruling stated that "it is a stretch to suggest that [Allen] knew of the legal jeopardy he placed himself in by admitting his actions during the August 2 altercation." Appellant's Appendix at 90. Under the circumstances, in which Allen told his cousin Beamon about an episode the evening before in which he was forced to defend himself from an attack by Beasley, we conclude that the trial court abused its discretion when it admitted such statements as statements against interest under Ind. Evidence Rule 804(b)(3). *See Camm v. State*, 908 N.E.2d 215, 233 (Ind. 2009) (noting that the hearsay exception provided by Ind. Evidence Rule 804(b)(3) was not available because none of the statements seeking to be admitted "constituted 'an admission of a crime' or

'tended to subject [the declarant] to criminal liability'"), *reh'g denied*; *Tolliver v. State*, 922 N.E.2d 1272, 1280 (Ind. Ct. App. 2010) (noting that "as a general matter, to qualify under this hearsay exception, the statement against interest must be incriminating on its face" (citing *Jervis*, 679 N.E.2d at 878)), *trans. denied*.

[24] This does not end our analysis, however. An error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Gault v. State*, 878 N.E.2d 1260, 1267-1268 (Ind. 2008). In this case one of the victims, Beamon, survived the shooting and testified at trial. Beamon specifically testified that he observed the shooters approach, and he identified Beasley and James as two of the shooters. When asked to describe the moment when he witnessed the shooters approaching the vehicle, Beamon testified that "[i]t was messed up because after lookin at the pictures and then you look up and you see the people right before your eyes that was in the picture you like wow and it . . . messed me up . . . it was surreal." Transcript at 572. He indicated that his identification of the shooters was not "just a particular feature of the picture" and instead "was body type and face and hair and the way they were shaped . . . ." *Id.* at 573. He also identified both Beasley and James from photo arrays prepared by Detective VanBuskirk the day after the shooting. We therefore conclude that while the trial court abused its discretion by admitting the hearsay statements of Allen through Beamon's testimony, this error was harmless. *See Tolliver*, 922 N.E.2d at 1281 (noting that any error in admitting hearsay

statements as statements against interest under Ind. Evidence Rule 804(b)(3) was harmless where independent eyewitness testimony identified Tolliver as the shooter and other testimony linked Tolliver to the type of gun used to kill the victim).[7]

B. *Officer Gallico's Testimony*

[25] Beasley argues that Officer Gallico's testimony that Beamon told him Beamon had been shot by Little Rock and J Rock does not satisfy the three-part test used for admitting out-of-court statements as evidence of an officer's course of investigation first articulated in *Craig v. State*, 630 N.E.2d 207, 211 (Ind. 1994), and recently reiterated in *Blount*, 22 N.E.3d at 566-567. He argues that the statement "falls within the highest category of risk" and accordingly "there is a greater certainty that the jury relied upon the statement as substantive evidence instead of for the limited purpose of understanding the method of investigation . . . ." Appellant's Brief at 23.

---

[7] Beasley argues in his brief that "[a]llowing Allen's statement to be admitted into evidence flies in the face of the protections afforded to defendants by Article I, Section 13 of the Indiana Constitution," and also that "[s]ince the statement made by Allen is a hearsay statement which does not fall within an exception . . . the admission of the statement through Beamon's testimony violated Leandrew's constitutional right to confront and cross examine witnesses." Appellant's Brief at 12. However, he does not cite to authority for these propositions or otherwise develop the arguments. Consequently, we find that he has waived these arguments. *Cooper v. State*, 854 N.E.2d 831, 834 n.1 (Ind. 2006) (holding that the defendant's contention was waived because it was "supported neither by cogent argument nor citation to authority"); *Shane v. State*, 716 N.E.2d 391, 398 n.3 (Ind. 1999) (holding that the defendant waived argument on appeal by failing to develop a cogent argument); *Smith v. State*, 822 N.E.2d 193, 202–203 (Ind. Ct. App. 2005) ("Generally, a party waives any issue raised on appeal where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record."), *trans. denied*.

The State argues that the court did not abuse its discretion in admitting Officer Gallico's testimony, "although not entirely for the reasons expressed by the trial court." Appellee's Brief at 24. The State notes that after the defendants objected, the State "initially argued that the testimony was admissible as an excited utterance" and was "entirely correct on this point." *Id.* The State maintains that "[t]he evidence amply supports a finding that Beamon was under the influence of a startling event when he made his statement," noting that "there can be no dispute that [he] had been shot and was bleeding when Officer Gallico encountered him" including having "been shot twice in the arm, once in the leg, and once in the stomach and had fashioned a tourniquet to stop the profuse bleeding in his arm shortly before he flagged down the officer for help." *Id.* at 25. The State further argues that the statements were "also admissible under Indiana Evidence Rule 801(d)(1)(C)," which instructs that "a statement is not hearsay if the declarant testifies in court, is subject to cross-examination about a prior statement, and the statement 'is an identification of a person shortly after perceiving the person.'" *Id.* at 27. The State asserts that Beamon testified and was subject to cross-examination, and accordingly "Officer Gallico's testimony relating to who Beamon told him were the shooters was not hearsay and was properly admitted . . . ." *Id.* The State finally notes that any error was harmless "because the same evidence was admitted at trial without objection during Beamon's testimony" and is merely cumulative of properly admitted evidence. *Id.* at 28.

[27] Beasley argues in his reply brief that "[t]he State is trying to create an issue in which no foundational basis was laid at trial." Appellant's Reply Brief at 8. Regarding the State's argument that the testimony was admissible under Ind. Evidence Rule 801(d)(1)(C), the question is "whether Beamon's identification of [Beasley] was made 'shortly after perceiving the person.'" *Id.* at 9. Beasley suggests that the pictures were shown to Beamon soon before the shooting and "were fresh in [his] mind when the shootings began," and thus "[i]t is more than likely that [he] was so focused on the individuals in this picture that he assumed that one of the shooters was [Beasley], rather than actually perceiving [Beasley] coming at him firing a weapon." *Id.* at 9-10.

[28] We observe that "[i]t is well-settled that '[t]he Court of Appeals may affirm the trial court's ruling [on the admissibility of evidence] if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court.'" *Reeves v. State*, 953 N.E.2d 665, 670 (Ind. Ct. App. 2011) (quoting *Scott v. State*, 883 N.E.2d 147, 152 (Ind. Ct. App. 2008)), *trans. denied*. At trial, Beamon testified that following the shooting he observed a police car coming towards him and he "walked out into the street . . . and I told him I had been shot, told him I had a firearm on me . . . ." Transcript at 397. He also testified that he told the responding officer that he had been shot by Little Rock and J Rock. Later in the trial, Officer Gallico testified that he responded "to the scene . . . of shots fired" and came upon Beamon who "flagged [him] down" while "standing in the street." *Id.* at 709. Officer Gallico noticed that Beamon was bleeding, and Beamon informed him that he had been shot and that he had

a gun on his person. Officer Gallico secured Beamon's weapon and had him sit down while they waited for paramedics, and Officer Gallico provided first aid. Officer Gallico was asked if he had a conversation with Beamon about what had occurred, and defense counsel objected. After a sidebar, the court overruled the objection and permitted the answer "as course of investigation." *Id.* at 715. The State then asked Officer Gallico if Beamon had identified any of the shooters at the scene and Officer Gallico responded: "He told me they go by J [R]ock and Little Rock." *Id.* at 717. Officer Gallico indicated that he then "broadcast that information out over the radio." *Id.*

[29] We find that the testimony given by Officer Gallico regarding Beamon's statements to him at the scene of the shooting were admissible under Ind. Evidence Rule 801(d)(1)(C), which provides that out-of-court statements are not hearsay when the "declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is an identification of a person shortly after perceiving the person." As noted, Beasley acknowledges that whether this rule applies turns on "whether Beamon's identification of Leandrew was made 'shortly after perceiving the person.'" Appellant's Reply Brief at 9. "The term 'shortly' is relative, not precise; the purpose of the rule is to assure reliability." *Davis v. State*, 13 N.E.3d 939, 945 (Ind. Ct. App. 2014) (quoting *Dickens v. State*, 754 N.E.2d 1, 6 n.6 (Ind. 2001)), *trans. denied*. Here, Beamon's statement identifying Little Rock and J Rock as the shooters was made mere minutes following the shooting, before paramedics had even responded. Under the circumstances, we conclude that Beamon's statement of identification was

made "shortly after perceiving the person." *See Kendall v. State*, 790 N.E.2d 122, 127 (Ind. Ct. App. 2003) (affirming admission of out-of-court statement of identification made one month after witness perceived event), *trans. denied*; *Robinson v. State*, 682 N.E.2d 806, 810 (Ind. Ct. App. 1997) (affirming admission of out-of-court statement of identification made two months and thirteen days after witness perceived event).

[30] Beamon testified at trial that he flagged down a police car at the scene and told the officer that he had been shot by Little Rock and J Rock, and he was subject to cross-examination about those statements, which were made shortly after perceiving Beasley and James. The court did not err in admitting the testimony of Officer Gallico regarding Beamon's identification at the scene of Beasley and James as two of the shooters. *See Gates v. State*, 702 N.E.2d 1076, 1077 (Ind. 1998) (noting that because the declarants "testified at trial about their identification of [the defendant] at the scene of the crime, other witnesses were free to repeat their statements").

## II.

[31] The next issue is whether the court committed fundamental error by not declaring a mistrial after Detective VanBuskirk gave testimony not supported by her investigation and the court admonished the jury to disregard the testimony. In general, a mistrial is an extreme remedy that is warranted only when less severe remedies will not satisfactorily correct the error. *Randolph v. State*, 755 N.E.2d 572, 575 (Ind. 2001). The decision to grant or deny a motion for

mistrial lies within the discretion of the trial court. *Id.* The trial court's determination will be reversed only where an abuse of discretion can be established. *Id.* To prevail, the appellant must establish that he was placed in a position of grave peril to which he should not have been subjected. *Id.* The gravity of the peril is determined by the probable persuasive effect on the jury's decision. *Leach v. State*, 699 N.E.2d 641, 644 (Ind. 1998). Where, as here, there was no request for a mistrial, the issue is generally waived on appeal. *Caruthers v. State*, 926 N.E.2d 1016, 1020 (Ind. 2010). We nevertheless sometimes entertain such claims under fundamental error, "meaning an error that makes a fair trial impossible or that constitutes a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm." *Id.*

[32] Beasley argues that he "was placed in grave peril to which he should not have been subjected and the admonishment did not cure the perilous situation in which he was placed." Appellant's Brief at 15. He asserts that Detective VanBuskirk's "assumption of kinship was not based on any fact" and that she "did not do any sort of investigation into Melvin Beasley as a possible third shooter." *Id.* He maintains that the grave peril Beasley was subjected to "could not be cured by any admonishment" because it "does not negate any conclusion that the testimony was intended to imply." *Id.* at 15-16. He argues that "[t]he wrong information lead the jury to believe a third related Beasley was possibly involved in this shooting and thus bolsters the State's claim that the other two Beasleys were involved." *Id.* at 16.

[33] The State contends that Beasley has not met the "heavy burden" required to show fundamental error and that his argument, which "is essentially challenging his trial counsel's strategic decision to forego making a mistrial motion if the court struck the offending testimony and admonished the jury to disregard that testimony," amounts to "error invited as part of a legitimate and reasonable trial strategy . . . ." Appellee's Brief at 17. The State argues that because Beasley invited any alleged error by not moving for a mistrial, he cannot show reversible error and, in any event, such error is not fundamental error. The State also asserts that Beasley has not demonstrated that a mistrial would have been granted had it been requested and that "[i]t is long-established law in this State that where a trial court strikes improper testimony and admonishes the jury to disregard that testimony the defendant is not placed in a position of grave peril because this remedy cures the error." *Id.* at 18. The State further contends that "the evidence identifying [Beasley] and his brother as the perpetrators of this deadly shooting was strong" and that accordingly any error is harmless. *Id.* at 19.

[34] At trial, Detective VanBuskirk was asked about three photo arrays she prepared and marked as State's Exhibits 7, 8, and 9. Exhibits 7 and 8 were photo arrays in which James and Beasley, respectively, appeared and were admitted without objection. Beasley objected regarding the introduction of State's Exhibit 9, which was a photo array in which Beamon marked "AK" and wrote "75-80%" next to one of the faces depicted, and the court admitted the exhibit over objection. State's Exhibit 9. After Exhibit 9 was admitted, Detective

VanBuskirk testified that the markings indicated that Beamon was "75 to 80 percent sure" that the individual in the picture was the third shooter who fired an "AK" rifle at the scene of the shooting. Transcript at 831. Beasley objected based upon hearsay grounds and that a proper foundation had not been laid for the evidence. At a sidebar conference, the court inquired "how is it she put him in an array," and the prosecutor responded that "[t]hese guys were known to hang out with him." *Id.* at 833.

[35] After the sidebar, Detective VanBuskirk was asked the name of the person featured in the picture identified by Beamon, and she responded: "Melvin Beasley." *Id.* at 836. She was then asked if that individual was related to the defendants and she testified: "I believe it's a cousin or an uncle." *Id.* Beasley's counsel was then allowed to *voir dire* Detective VanBuskirk, and she testified that she knew the identity of the person in the picture because "[i]t's on the X-image machine" which is "an internal record that's maintained by the police department." *Id.* at 837. She further testified that in creating the photo arrays for Beasley and James, she searched the name "Beasley" in the database and, in addition to finding pictures for the codefendants, "Melvin's [picture] came up too and" she "threw him in an array." *Id.* at 838. She admitted that prior to that time she did not have "any first-hand knowledge of Melvin Beasley," and when asked the basis for her testimony that Melvin was a cousin or possibly an uncle of the codefendants, she testified: "I believe he has reports from the same general area that would lead me to believe he's some kind of kin." *Id.* 838-839.

[36] Beasley's counsel argued that it was improper for Detective VanBuskirk to testify about any relationship between Melvin Beasley and the codefendants "without any basis whatsoever" and asked the court "to strike the evidence and admonish the jury" or he would request a mistrial. *Id.* at 843. After further discussion, the court agreed with Beasley and admonished the jury as follows:

> Ladies and gentlemen, when we -- we left there was the last question asked before the -- exhibits were passed and the detective's response to that question that she believed that the person identified in exhibit 9 was a cousin or an uncle had no basis in fact -- there was no foundation for her to say that, all right so that is to be stricken from the record and you are not to consider that during your -- during your deliberations -- is that clear -- all right -- okay. That is the admonishment.

*Id.* at 849-850.

[37] "The remedy of mistrial is 'extreme,' strong medicine that should be prescribed only when 'no other action can be expected to remedy the situation' at the trial level." *Lucio v. State*, 907 N.E.2d 1008, 1010-1011 (Ind. 2009) (internal citations omitted). Where improper testimony has been offered, clear admonishments by the court, "together with strong presumptions that juries follow courts' instructions and that an admonition cures any error, severely undercuts" a defendant's contention that a mistrial is warranted. *Id.* at 1011; *see also Warren v. State*, 757 N.E.2d 995, 999 (Ind. 2001) (noting that "reversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings" (quoting *Bradley v. State*, 649 N.E.2d 100, 108 (Ind. 1995), *reh'g denied*)). Here, the trial court admonished the jury to strike

from the record and not consider the testimony of Detective VanBuskirk that Melvin Beasley was related to Beasley and James. Under the circumstances, we cannot say that Beasley has demonstrated that he was subjected to grave peril. Further, we cannot say that any error amounts to fundamental error, particularly where he suggested he would move for a mistrial if the court did not admonish the jury, the court issued an admonishment, and Beasley then declined to request a mistrial. "A party may not invite error, then later argue that the error supports reversal, because error invited by the complaining party is not reversible error." *Booher v. State*, 773 N.E.2d 814, 822 (Ind. 2002) (quoting *Ellis v. State*, 707 N.E.2d 797, 803 (Ind. 1999) (quoting *Kingery v. State*, 659 N.E.2d 490, 494 (Ind. 1995), *reh'g denied*)). Beasley has not shown he was subjected to clear, blatant violations of basic and elementary principles of due process presenting an undeniable and substantial potential for harm; accordingly, he has not demonstrated fundamental error.

[38] We conclude that the court's admonishment to the jury that the testimony of Detective VanBuskirk regarding any relation between Melvin Beasley and Beasley was stricken from the record and was not to be considered, and to not declare a mistrial, did not result in fundamental error.

III.

[39] The next issue is whether the court erred in denying Beasley's motion for mistrial after Juror No. 9 told the other jurors that she recognized a person in the gallery and was concerned for her safety and well-being. A trial court is in

the best position to evaluate whether a mistrial is warranted because it can assess first-hand all relevant facts and circumstances and their impact on the jury. *Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014) (citing *Kelley v. State*, 555 N.E.2d 140, 141 (Ind. 1990)). We therefore review denial of a motion for mistrial only for an abuse of discretion. *Id.* (citing *Gregory v. State*, 540 N.E.2d 585, 589 (Ind. 1989)). However, the correct legal standard for a mistrial is a pure question of law, which we review *de novo*. *Id.* (citing *Hartman v. State*, 988 N.E.2d 785, 788 (Ind. 2013)).

[40] Beasley argues that he "was placed in a position of grave peril and subjected to undue prejudice because Juror 9 discussed with the rest of the jury that she recognized someone in the gallery and was concerned with her safety due to the possibility she may see the individual in the future." Appellant's Brief at 17. He maintains that "[t]he jury was compromised because each juror saw the physical and reaction [sic] of Juror 9's fear and such observations must have played a role in their decision making process." *Id.* He argues that "[w]hile some jurors claimed Juror 9's fear did not infect deliberations, the Court never inquired whether it affected how the individual juror perceived the fear as evidence was still being admitted," noting that "[t]he record reflects some jurors knew of Juror 9's fear while evidence was still being presented." *Id.* at 19. Beasley asserts that "whether subconsciously or consciously, all the jurors knowing [he] had retaliatory or scary associates had to, at the least, reinforce weighing the evidence against him." *Id.*

[41] The State argues that despite Beasley's suggestion of influence on other jurors, the court interviewed each juror and they uniformly stated "that their reaction to Juror #9's dilemma was only concern for Juror #9's well-being and that the situation did not impact their deliberations in anyway [sic] whatsoever." Appellee's Brief at 21. The State asserts that "[a] trial court's admonishment to disregard what has occurred at trial is usually considered a sufficiently curative measure so that the refusal to grant a mistrial motion is not reversible error." *Id.* at 21-22. The State argues that Beasley "was not placed in a position of grave peril because the remaining jurors were not tainted by Juror #9's concerns, and the trial court admonished the jury. Under these circumstances, the trial court's denial of [his] mistrial motion did not constitute an abuse of discretion." *Id.* at 22.

[42] Initially, we note that the arguments of both Beasley and the State attempt to apply the "grave peril" standard generally applicable to motions for mistrial raised by defendants and discussed above in Part II. However, as discussed in James's appeal issued as a companion to the instant case, the Indiana Supreme Court recently in *Ramirez* instructed courts that the grave peril standard is inapplicable to examining whether the grant of a mistrial is warranted based upon jury taint. *Beasley v. State*, No. 49A04-1406-CR-253, slip op. at 26 n.6 (Ind. Ct. App. ____ __, 2015) (citing *Ramirez*, 7 N.E.3d at 940-941). The *Ramirez* Court clarified how courts should analyze motions for mistrial based upon jury taint as follows:

Defendants seeking a mistrial for suspected jury taint are entitled to the presumption of prejudice only after making two showings, by a preponderance of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury. The burden then shifts to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless. If the State does not rebut the presumption, the trial court must grant a new trial. On the other hand, if a defendant fails to make the initial two-part showing, the presumption does not apply. Instead, the trial court must apply the probable harm standard for juror misconduct, granting a new trial only if the misconduct is "gross and probably harmed" the defendant. But in egregious cases where juror conduct fundamentally compromises the appearance of juror neutrality, trial courts should skip [the] two-part inquiry, find irrebuttable prejudice, and immediately declare a mistrial. At all times, trial courts have discretion to decide whether a defendant has satisfied the initial two-part showing necessary to obtain the presumption of prejudice or a finding of irrebuttable prejudice.

7 N.E.3d at 939 (certain internal citations omitted).

[43] We first find that Beasley is not entitled to a presumption of prejudice because he failed to show that extra-judicial contact or communications between jurors and unauthorized persons occurred. Indeed, the record does not suggest that any extra-judicial contact or communications occurred at all. The record reflects that Juror No. 9 noticed a person sitting in the gallery who she recognized and who caused concern for her safety. Beyond sitting in proximity of one another while in the courtroom, the record does not suggest any type of interaction between Juror No. 9 and the person in the gallery. In order for the presumption to attach, the defendant must show by a preponderance of the

evidence that extra-judicial contact occurred.  Not having done so, Beasley is not entitled to a presumption of prejudice.

[44]  We must therefore apply the probable harm standard for juror misconduct, granting a new trial only if the misconduct is "gross and probably harmed" the defendant, which we review for an abuse of discretion.  *See Henri v. Curto*, 908 N.E.2d 196, 202 (Ind. 2009).  Here, we find that the conduct at issue falls short of gross misconduct.  For instance, this court found that a juror's misconduct was gross and probably harmed the defendant in *Dickenson v. State*, 732 N.E.2d 238 (Ind. Ct. App. 2000).  In that case, during *voir dire*, a potential juror Tammy Lane was asked whether she had a relationship with the defendant or potential witnesses that would affect her ability to be an impartial juror, and she "did not acknowledge that she had such a relationship with Dickenson, who had been her neighbor during childhood" and instead "stated that she knew a few of the potential witnesses, but that her ability to weigh the testimony of those witnesses would not be affected."  732 N.E.2d at 240.  She also did not respond when asked whether she had prior knowledge about the facts of the case.  *Id.* Lane was chosen as a juror, and, following the verdict of guilty, a member of Dickenson's family recognized her while she was being examined.  *Id.*  Further investigation revealed that Lane "had lied about her relationship to witness Karen Stinnett [], who was the victim's wife, and her pre-trial knowledge of the case."  *Id.*  On post-conviction, this court reversed and ordered a new trial, concluding that Lane's act of lying during *voir dire* constituted juror misconduct and that "because the evidence reveals that juror Lane had knowledge of the

case prior to trial, and was friendly with the victim's wife, who testified at trial . . . the misconduct was gross and probably harmed the defendant." *Id.* at 242.

[45] By contrast, in this case Juror No. 9 did not lie or otherwise make misrepresentations. She became concerned for her safety late in the trial, and she divulged her concerns during deliberations. When the court learned of her concerns, it ordered that deliberations cease and interviewed each juror individually, starting with Juror No. 9. Each of the remaining jurors assured the court that the statements by Juror No. 9 would not influence their deliberations. Juror No. 2 noted that "it's a personal concern for" Juror No. 9. Transcript at 959. Juror No. 5, stated that it did not change his/her "perspective in any way" and that, other than with respect to Juror No. 9, it would not change the other jurors' "ability to deliberate or their perspective." *Id.* at 964. Juror No. 6 stated that the other jurors were "just showing concern for [Juror No. 9] really." *Id.* at 967. Juror No. 10 stated: "I do not think it changed anyone's verdict." *Id.* at 974. The court then decided to remove Juror No. 9 and replace her with Alternate Juror No. 1 and admonished the jury by instructing them not to discuss the reasons for Juror No. 9's dismissal.

[46] Based on the foregoing, we cannot say that the court abused its discretion when it denied Beasley's motion for mistrial. *See Henri*, 908 N.E.2d at 202-204 (holding that the defendant failed to show misconduct which was gross and probably harmed the defendant based upon claims that one juror's receipt of a cell phone call created pressure to reach a hasty verdict, and that the alternate juror communicated with the regular jurors during deliberations); *see also*

*Weisheit v. State*, 26 N.E.3d 3, 13-14 (Ind. 2015) (holding that the trial court did not err in denying the defendant's motion for a mistrial after it was discovered that one of the jurors delivered cookies to the jury room baked by his wife which contained an attached note stating "Thank you for your service for the family of Alyssa [and] Caleb Lynch. I will pray for you all to have strength and wisdom to deal with the days ahead. God bless!" the court interviewed each juror individually and determined that the note had no impact on the jurors, and it removed the juror who brought the cookies and replaced the juror with an alternate).

## Conclusion

[47] For the foregoing reasons, we affirm Beasley's convictions for murder, attempted murder, a class A felony, and unlawful possession of a firearm by a serious violent felon, a class B felony.

[48] Affirmed.

Bailey, J., and Robb, J., concur.